UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

JAMES REPINEC,

               Plaintiff,

v.

TODD FINCHER, *et al.*,

               Defendants.

Case No. 2:14-cv-01067-RFB-GWF

**ORDER**

## I.  INTRODUCTION

Plaintiff James RePinec brings this civil rights action under 42 U.S.C. § 1983, asserting a claim under the Fourth Amendment of the United States Constitution. He alleges that his Fourth Amendment rights were violated when he was subjected to a forced blood draw while detained at the Public Safety Building of the White Pine County Jail in Ely, Nevada, on September 10, 2012. Defendants, all of whom were involved with the forced blood draw, are officials employed or contracted by the Nevada Department of Public Safety and the Sheriff's Office of White Pine County, Nevada. This case is before the Court on two motions for summary judgment. For the reasons discussed below, the Court grants summary judgment in favor of Defendants on the issue of whether the decision to perform the forced blood draw violated the Fourth Amendment. The Court denies summary judgment on the issue of whether the force actually used by Defendants during the blood draw violated the Fourth Amendment.

## II.  BACKGROUND

### A.  Procedural History

RePinec's Amended Complaint is the operative complaint in this action. It names the

following individuals as Defendants: Todd Fincher, a Sergeant in the White Pine County Sheriff's Office; James Robinson, a Deputy in the White Pine County Sheriff's Office; Chris Brewer, a Sergeant with the Nevada Department of Public Safety; John Cessford, a Detective with the Nevada Department of Public Safety; and JoAnne Stratton, a Registered Nurse contracted by White Pine County. In his Amended Complaint, RePinec alleges that he was arrested by Sergeant Fincher on September 10, 2012 for suspicion of driving under the influence. RePinec alleges that after administering field sobriety tests and collecting a urine sample, Fincher, with the assistance of the other Defendants, used excessive force against him to obtain a blood sample against RePinec's will. RePinec brings a single cause of action in his Amended Complaint for violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

The Court screened the Amended Complaint on July 31, 2014 and allowed it to proceed as alleged against all Defendants in their personal capacities, but dismissed the claims as alleged against Defendants in their official capacities. ECF No. 5. On January 23, 2015, Defendants filed two motions for summary judgment. ECF No. 27, 28. The first motion, submitted by Defendants Brewer and Cessford, seeks partial summary judgment on RePinec's Fourth Amendment claim to the extent it asserts that RePinec's rights were violated by the decision to take his blood, regardless of the degree of force used. ECF No. 27.[1] The second Motion for Summary Judgment, submitted by Defendants Fincher, Robinson, and Stratton, seeks summary judgment on RePinec's entire claim. ECF No. 28. These Defendants argue that RePinec is barred under the doctrine of collateral estoppel from arguing that the blood draw itself violated his Fourth Amendment rights and that their use of force during the blood draw was objectively reasonable. Alternatively, these Defendants argue that even if the force used did violate the Fourth Amendment, they are entitled to qualified immunity.

On February 16, 2016, the Court held a hearing and oral argument on Defendants' Motions for Summary Judgment and took the motions under submission. On March 31, 2016, the Court granted Brewer and Cessford's Motion for Partial Summary Judgment (ECF No. 27) and denied

---

[1] In this motion, Brewer and Cessford do not seek summary judgment on the issue of whether their specific actions during the blood draw constituted excessive force.

1   Fincher, Robinson, and Stratton's Motion for Summary Judgment (ECF No. 28). The Court stated

2   that a written order would issue. This Order sets forth the Court's reasoning for its rulings.

3

4       **B. Undisputed Facts**

5       After reviewing the evidence submitted by the parties, the Court finds the following

6   undisputed facts.

7       On September 10, 2012 at approximately 8:00 p.m., Sergeant Fincher initiated a traffic

8   stop of RePinec for operating an off-highway vehicle on a public road. After seeing Fincher's

9   emergency lights, RePinec stopped the vehicle he was driving, got out of his vehicle, walked

10  toward Fincher's car, and asked Fincher a question. Fincher then told RePinec to return to his

11  vehicle, which he did. On the way back to his vehicle, RePinec threw a bundled up piece of paper

12  to the ground. Sergeant Fincher observed RePinec throw the paper to the ground, determined that

13  it appeared to contain methamphetamine, and handcuffed RePinec and administered a <u>Miranda</u>

14  warning. Fincher then transported RePinec to the Public Safety Building of the White Pine County

15  Jail.

16      After arriving at the Public Safety Building, Fincher observed that RePinec's eyes were

17  watery and bloodshot and that his pupils appeared to be dilated. Fincher then decided to administer

18  field sobriety tests to RePinec, and RePinec complied. Fincher administered four tests to RePinec:

19  (1) Horizontal Gaze and Nystagmus, (2) Nine Step Walk and Turn, (3) One Leg Stand, and (4) the

20  Modified Rhomberg Test, which measures a person's ability to estimate the passage of time.

21  RePinec's results for the Modified Rhomberg Test were normal. Based upon the overall results of

22  the tests, however, Fincher determined that RePinec had shown impairment.

23      Fincher also administered a Preliminary Breath Test to RePinec, which indicated a blood-

24  alcohol content of zero. Fincher then read Nevada's implied consent statute[2] to RePinec and asked

25  _____

26  [2] At the time of this incident, Nevada's implied consent statute authorized police officers to require
    individuals to submit to blood or urine tests, or both, if the presence of a controlled substance in the blood
27  or urine of the person was in issue. N.R.S. 484C.160(5) (2009). If the person refused to submit to the
    required test and the officer had reasonable grounds to believe the person was driving a vehicle while under
28  the influence of an intoxicating substance, the statute also authorized the officer to "direct that reasonable
    force be used to the extent necessary to obtain samples of blood from the person to be tested." N.R.S.
    484C.160(7) (2009).

- 3 -

him for a blood or urine sample. Initially, RePinec did not believe that the police had the legal authority to physically force him to submit to a blood or urine test, and thus refused Fincher's request. RePinec also told Fincher that he wanted to have an attorney present before he did anything. Fincher informed RePinec that he did not have the right to an attorney for this test. Fincher then told RePinec "you can either give me urine or I'm going to take blood." RePinec continued to refuse to submit to either test and was placed in a holding cell.

RePinec then requested to speak with Deputy Robinson. Robinson came to the holding cell, informed RePinec that the officers wanted a urine sample from him, and read over the implied consent form with RePinec. RePinec then agreed to give the officers a urine sample, but reiterated that he did not want to give a blood sample.

After RePinec gave a urine sample, Fincher and Robinson took him out of the holding cell to the booking area, where Sergeant Brewer and Detective Cessford were located. A fifth officer, Deputy Sommervolt, was also in the booking area. After RePinec was brought to the booking area, Fincher told RePinec "I want blood now, I want that evidence." RePinec began yelling at Fincher that he was not going to submit to a blood test. RePinec told Fincher "you told me the urinalysis would be fine." RePinec then raised his fists and told Fincher that he would rather die than let Fincher put a needle in him. RePinec was approximately five feet away from Fincher as he did this, and was even further away from the other officers. Robinson immediately pulled out his Taser and pointed it at RePinec's chest, and Fincher said "drop them." After seeing the laser target from the Taser pointed at his chest, RePinec lowered his fists, said "all right," turned around so that his back was facing the officers, and placed both hands against the wall.

The four officers then placed RePinec into a restraint chair in the booking room. The chair was equipped with restraints for a person's legs and arms, and the restraints were all in working condition. The officers secured RePinec's legs using the chair's restraints, but did not secure his arms. The officers could have secured RePinec's arms using the restraints but chose not to do so. The officers then physically restrained RePinec, including his arms, while Nurse Stratton withdrew two vials of blood.

Nurse Stratton sought to withdraw the first vial of blood from RePinec's left hand. She had to insert the needle at least three times into RePinec's hand before she could obtain the first vial because RePinec, while being restrained by the officers, was yelling and actively resisting her attempts at taking a blood sample. Even while RePinec was being restrained by the officers, his arms were not perfectly still and were still moving. After obtaining this first vial of blood, Stratton stepped back and said, "I can't do this unless you guys have him under control." Stratton then took another vial of blood from RePinec's right arm. She inserted the needle mid-arm at his elbow crease, but needed to do so two times before she could obtain the second vial of blood. During the extraction of the second vial of blood, Sergeant Fincher placed his baton between the arm of the chair and RePinec's elbow and used the baton with both hands to pry RePinec's arm open so that Nurse Stratton could insert the needle.

After Stratton obtained the second vial, all but two officers left the booking area. The two remaining officers secured RePinec's arms using the chair's restraints. RePinec then told the remaining officers, "Okay, I'm calm. You guys can take me out of the restraint chair." After the blood draw, a Response to Resistance form was completed which stated that officers had used "bent wrist" and "shoulder lock" techniques, had displayed a Taser, and that RePinec had a visible injury described as "blood in mouth." There was no testimony that the officers were following an established procedure or set of protocols when they physically restrained RePinec, nor was there testimony that Nurse Stratton was following such procedures or protocols when she inserted the needle multiple times to withdraw two vials of blood from RePinec. The results of RePinec's blood test were positive for methamphetamine. The urine test results also came back as presumptively positive for methamphetamine.

The forced withdrawal of RePinec's blood performed in the booking area was recorded on video and was preserved for future litigation. RePinec requested a copy of the video for use in his state criminal proceeding on or about January 29, 2013, but the video was not produced. An official of the White Pine County Sheriff's Office stated that the hard drive on which the video was located had "gone bad" and that the DVD containing the video could not be copied or played.

1    In his state criminal proceeding, RePinec filed a motion to suppress evidence and argued

2    that N.R.S. 484C.160(7)—the provision authorizing officers to use reasonable force to obtain a

3    blood sample from a noncompliant individual where the police have reasonable grounds to believe

4    the individual was engaging in one of the acts listed in the subsection—violated the Fourth

5    Amendment pursuant to <u>Missouri v. McNeely</u>, 133 S.Ct. 1552 (2013). The state district court

6    found that N.R.S. 484C.160(7) violated the Fourth Amendment and invalidated that subsection of

7    the implied consent statute, allowing the remainder of the statute to stand. The district court

8    nevertheless declined to apply the exclusionary rule to the evidence obtained from the forced blood

9    draw, finding that it was objectively reasonable for the officers to rely on N.R.S. 484C.160(7) at

10   the time they conducted the forced warrantless blood draw. RePinec's motion to suppress was

11   therefore denied, and RePinec was convicted of unlawful use of a controlled substance.

12

13   **C.  Disputed Facts**

14   The parties dispute several relevant facts. RePinec claims that as he dropped his fists and

15   turned to face the wall after having Robinson's Taser pointed at him, he saw Sergeant Brewer and

16   Detective Cessford moving toward him. RePinec further claims that within seconds after turning

17   around and placing his hands on the wall, either Brewer or Cessford punched RePinec in the face

18   and the other officer grabbed him around the neck. RePinec asserts that he was momentarily

19   knocked unconscious by the punch and chokehold and that when he came to his senses, he was in

20   the restraint chair and Cessford had his arm around RePinec's neck in a chokehold. As he began

21   to resist Nurse Stratton's efforts to draw blood, RePinec claims that Brewer and Robinson were on

22   either side of RePinec and that each of them punched him in the torso one or two times with closed

23   fists to gain control of his arms. Defendants dispute each of these assertions.

24   RePinec claims that as a result of Defendants' actions, he suffered the following injuries:

25   blood in the left side of his mouth from Brewer's or Cessford's punch to the face; a bruise on the

26   back of his arm and soreness in his elbow from Fincher's use of the baton, lasting approximately

27   three days; pain and bruising on both sides of his torso from Brewer's and Robinson's punches

28   while he was in the restraint chair, lasting approximately three days; soreness in his shoulders from

being restrained during the blood draw, lasting approximately three days; and an infection in his right arm from Nurse Stratton's needle, which left a scar and took approximately a month to heal.

## III.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).

Where the party seeking summary judgment does not have the ultimate burden of persuasion at trial, it "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its [initial] burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. If it fails to carry this initial burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Id. at 1102-03. If the movant has carried its initial burden, "the nonmoving party must produce evidence to support its claim or defense." Id. at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). However, the ultimate burden of persuasion on a motion for summary judgment rests with the moving party, who must convince the court that no genuine issue of material fact exists. Nissan Fire, 210 F.3d at 1102.

## IV.     DISCUSSION

RePinec asserts a single cause of action under the Fourth Amendment in his Amended Complaint. However, as Brewer and Cessford discuss in their Motion for Summary Judgment, RePinec appears to be asserting both facial and as-applied Fourth Amendment challenges to the forced blood draw. After considering the parties' arguments and the evidence in the record, the Court finds that summary judgment must be granted in favor of Defendants to the extent RePinec argues that the decision to take his blood without his consent, in and of itself, violated the Fourth Amendment. However, summary judgment is denied on the issue of whether the force actually used by Defendants in this case violated the Fourth Amendment.

### A.  RePinec's Claim That the Seizure of His Blood Was Facially Unconstitutional

Defendants argue that summary judgment should be granted on RePinec's facial Fourth Amendment claim for two reasons. First, Defendants contend that RePinec is barred under the doctrine of issue preclusion from arguing that the forced blood draw itself was in violation of his Fourth Amendment rights. RePinec did not respond to this aspect of Defendants' argument. Second, Defendants claim that they are entitled to qualified immunity. The Court agrees that Defendants are entitled to qualified immunity to the extent RePinec asserts that the decision to conduct a blood draw without his consent was *per se* violative of the Fourth Amendment.[3]

### 1.  Applicable Law

"Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Chappell v. Mandeville, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine "ensures that 'officers are on notice their conduct is unlawful' before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

The qualified immunity inquiry has two prongs: "(1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a

_____

[3] The Court finds it unnecessary to address Defendants' issue preclusion argument.

constitutional right; and (2) if so, whether the right was clearly established in light of the specific case." Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Under the second prong, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Tarabochia, 766 F.3d at 1125 (internal quotation marks omitted). While a case directly on point is not required in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011).

### 2. Qualified Immunity Applies to Defendants' Reliance on N.R.S. 484C.160(7)

The Court finds that Defendants are entitled to qualified immunity for their decision to seize RePinec's blood without his consent. The forced blood draw in this case occurred on September 10, 2012. At that time, N.R.S. 484C.160(7) authorized the Defendant officers to use reasonable force to obtain blood samples from RePinec if they had reasonable grounds to believe he was driving while under the influence of a controlled substance and if he failed to submit to the blood test. "[A]n officer who acts in reliance on a duly-enacted statute or ordinance is ordinarily entitled to qualified immunity." Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir. 1994). While an exception to this rule exists "[w]here a statute authorizes official conduct which is patently violative of fundamental constitutional principles," id., the Court does not find that this exception applies here. A reasonable officer would not have known that the conduct authorized by N.R.S. 484C.160(7) was "patently violative" of fundamental constitutional principles at the time of RePinec's blood draw. The Nevada Supreme Court did not rule that N.R.S. 484C.160(7) was unconstitutional until 2014. See Byars v. State, 336 P.3d 939 (Nev. 2014). Moreover, the United States Supreme Court decision upon which the Nevada Supreme Court relied in Byars was not decided until seven months after RePinec's forced blood draw. See Missouri v. McNeely, 133 S.Ct. 1552 (2013). And as the state court recognized in RePinec's criminal proceeding, prior to its decision in Byars the Nevada Supreme Court had implicitly recognized the validity of a previous version of the forced-blood-draw statute. See Brockett v. State, 817 P.2d 1183 (Nev. 1991) (affirming the district court's judgment of conviction and analyzing whether the forced-blood-

draw statute applied under the circumstances). Therefore, at the time of the events giving rise to this case, it was not clearly established that conducting a forced blood draw was unlawful, and Defendants are entitled to qualified immunity insofar as RePinec's claim is based on that decision.

### B. RePinec's As-Applied Fourth Amendment Claim Against the Officers

Next, Defendants argue that summary judgment must be granted in their favor because there is no genuine factual dispute that the force used against RePinec was reasonable under the circumstances. The Court disagrees and finds that several genuine issues of material fact exist. Resolving factual disputes in RePinec's favor, as it must at this stage, the Court finds that a reasonable jury could conclude that each Defendant officer's use of force violated the Fourth Amendment. The Court also finds that the officers are not entitled to qualified immunity for the force they used.[4]

#### 1. Whether the Officers' Use of Force Violated the Fourth Amendment

##### a. Applicable Law

"A Fourth Amendment claim of excessive force is analyzed under the framework outlined by the Supreme Court in Graham v. Connor. Under Graham, *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Davis v. City of Las Vegas, 478 F.3d 1048, 1053-54 (9th Cir. 2007) (quoting Graham, 490 U.S. 386, 390 (1989)) (citation omitted) (emphasis in original). This reasonableness inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.

In determining whether a particular use of force was unreasonable and therefore in violation of the Fourth Amendment, courts must balance "the nature and quality of the intrusion

---

[4] In this section, the Court discusses undisputed and disputed facts. It will not note the distinction each time. Rather, the Court resolves factual disputes, as it is required to do, in RePinec's favor for the purpose of the analysis in this section. That is, the Court analyzes the quantum of force based on the allegations of RePinec, since the dispute about the quantum of force has no legal significance unless the alleged quantum of force is excessive under the Fourth Amendment.

on the individual's Fourth Amendment interests" against the government's countervailing interests. Id. at 394 (citation omitted). Thus, it is first necessary to assess the quantum of force used against the plaintiff, and then to weigh it against the governmental interests at stake by considering a range of factors, including those listed in Graham. Davis, 478 F.3d at 1054. The Graham court listed three specific factors to be considered: (1) the severity of the crime at issue, (2) whether the suspect presents an immediate threat to the officer or to public safety; and (3) whether the suspect is actively resisting or evading arrest. Id. at 396.

Courts are nevertheless free to consider other factors, whether or not specifically set out by the Supreme Court in Graham. Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994). Other factors that have previously been considered by the Ninth Circuit include whether the officer warned the individual prior to using force and whether the officer considered the existence of feasible alternatives. Bryan v. MacPherson, 630 F.3d 805, 831, 831 n.15 (9th Cir. 2010). Additionally, in the context of blood tests, courts may consider "the degree of the authorities' need for the blood sample," including "whether the police 'refused to respect a reasonable request to undergo a different form of testing.'" Nelson v. City of Irvine, 143 F.3d 1196, 1202 (9th Cir. 1998) (quoting Hammer v. Gross, 932 F.2d 845, 846 (9th Cir. 1991) (en banc) (plurality opinion)).

b.  Genuine Issues of Disputed Fact Exist As to Whether the Officers' Use of Force Violated the Fourth Amendment

The Court finds that the facts in this case, viewed in the light most favorable to RePinec, demonstrate that the force used by Defendants was objectively unreasonable and that RePinec's Fourth Amendment rights were violated.

i.  *Quantum of Force Used*

The Court begins by assessing the various degrees of force used against RePinec by the officers.

(a)  Sergeant Fincher

Fincher used his baton as a pry bar to force open RePinec's arm for Nurse Stratton. The Court is not aware of any precedent setting forth the quantum of force for the use of a baton as a pry bar. Nonetheless, the Court finds the force used by Fincher to be non-trivial. See Nelson v.

- 11 -

1    City of Davis, 685 F.3d 867, 878 (9th Cir. 2012) ("[P]hysical blows or cuts often constitute a more

2    substantial application of force than categories of force that do not involve a physical impact to

3    the body.") (internal quotation marks omitted). This finding is supported by the fact that RePinec

4    allegedly suffered actual injuries (bruising and soreness) from Fincher's use of the baton.

5                                          (b)    Deputy Robinson

6          RePinec testified that while he was in the restraint chair, Robinson punched him once or

7    twice in the side of his torso with a closed fist. The Court finds this application of force to be

8    significant. See id.; cf. Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994) (finding

9    the quantum of force used in pain compliance holds to be "less significant than most claims of

10   force" and noting that officers "did not deliver physical blows or cuts.").

11         Defendants argue that there is no evidence beyond RePinec's own self-serving statement

12   that Robinson used any force against him at all. To support their argument, Defendants point to

13   the fact that RePinec did not mention any excessive force used by Robinson in his underlying

14   criminal case, in his Fast Track Statement to the Nevada Supreme Court, or in his original

15   Complaint in this case. The Court does not agree that RePinec's sworn testimony is

16   "uncorroborated and self-serving" such that a reasonable jury could not believe it. Villiarimo v.

17   Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). The fact that RePinec has no other

18   evidence to support his allegation against Robinson is through no fault of his own. There were no

19   independent witnesses to this incident. Further, Defendants admit that the incident was recorded

20   on video, but state that the video is not playable. Under these circumstances, where evidence that

21   might have corroborated RePinec's testimony is unavailable to him due to circumstances beyond

22   his control, the Court finds RePinec's testimony to be sufficient to create a genuine issue of

23   material fact as to Robinson's conduct. Viewed in the light most favorable to RePinec, the force

24   used by Robinson was significant.

25                                         (c)    Detective Cessford

26         RePinec testified that after he placed his hands on the wall, Cessford either placed him in

27   a chokehold, causing him to lose consciousness, or punched him in the face, causing his mouth to

28   bleed. RePinec also testified that Cessford placed him in a chokehold during the blood draw. A

chokehold can cause serious bodily injury or even death. See Maddox v. City of Los Angeles, 792 F.2d 1408, 1411 (9th Cir. 1986) (officer's application of chokehold for 20 to 30 seconds caused detainee's death). RePinec also claims that his neck was sore for several days after the blood draw, demonstrating that the chokehold was applied forcefully. Therefore, the Court finds the chokehold applied by Detective Cessford to be a severe application of force. In addition, based on the law set forth above, the Court finds that if Cessford punched RePinec in the face, that quantum of force was significant.

(d)   Sergeant Brewer

RePinec testified that Brewer, like Cessford, either placed him in a chokehold or punched him in the face while his hands were against the wall. RePinec also testified that Brewer, like Robinson, punched RePinec in the torso once or twice with a closed fist while RePinec was in the restraint chair. Based on the law set forth previously, the force used by Brewer was significant (if he was not the one to apply the chokehold) or severe (if he was).

ii.   Governmental Interest In the Use of Force

Next, the Court assesses the government's interests in using force. In undertaking this analysis, courts are guided by Graham's three core factors, but nonetheless also "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case." Bryan, 630 F.3d at 826. Here, the Court finds the government's interest in using force against RePinec to be minimal. Several factors support this conclusion.

(a)   Immediate Threat to Safety

"The most important factor under Graham is whether the suspect posed an immediate threat to the safety of the officers or others." Id. at 826. In this case, there was no reason to believe that RePinec posed an immediate threat to anyone's safety at any time when force was used on him. Defendants argue that RePinec was "threatening the officers and inciting them to fight" at the time force was applied. However, at the summary judgment stage, the Court views all facts in the light most favorable to the nonmoving party (RePinec). These facts establish that at the time he was first punched in the face and placed in a chokehold, RePinec had already lowered his fists, said "all right," turned around, and placed both hands on the wall. Further, at the time RePinec was

1    punched in the torso and placed in a second chokehold and had his arm pried open by a baton,

2    RePinec was in the restraint chair with his legs secured and was surrounded by five officers. While

3    RePinec admits he was struggling and resisting, there is no testimony or evidence that he was

4    punching, kicking, or biting any of the officers or the nurse. It cannot reasonably be said that

5    RePinec posed an immediate threat to the safety of anyone in the area. This factor therefore

6    supports a finding that the force used was unreasonable and excessive.

7                                  (b)     Severity of the Offense

8          The offenses for which RePinec was arrested are serious in nature. RePinec was suspected

9    of unlawfully using a controlled substance, a felony, as well as driving under the influence of a

10   controlled substance, a misdemeanor for a first offense within 7 years. However, the facts show

11   that the officers did not use force in response to these offenses. Rather, the force at issue here was

12   used in response to RePinec's acts of raising his fists and resisting the nurse's attempts to take his

13   blood. RePinec's act of raising his fists to fight the officers could be construed as assault upon a

14   police officer, which is a category D felony under Nevada law. See N.R.S. 200.471(2)(c).

15   However, the fact that RePinec had already lowered his fists, turned around, and placed his hands

16   against the wall at the time he was first punched substantially lessens the weight of this factor. In

17   addition, Defendants did not attempt to justify their actions by arguing that RePinec was attempting

18   assault on a police officer at the time they used force against him. See Nelson v. City of Davis,

19   685 F.3d 867, 879 (9th Cir. 2012) (noting that the severity of the crime factor weighed in favor of

20   the plaintiff, in part because "[t]he police did not contend that Nelson or any of his companions

21   were committing a crime at the time that he was shot" and that "[a]fter he was incapacitated, the

22   police did not place him under arrest but rather walked past him as he lay on the ground")

23   (emphasis added). This factor supports a finding that the force used was disproportionate and

24   unreasonable compared to the severity of the offense.

25                                 (c)     Active Resistance or Flight

26         Resistance "runs the gamut from the purely passive protestor who simply refuses to stand,

27   to the individual who is physically assaulting the officer." Bryan, 630 F.3d at 830. "Even purely

28

1  passive resistance can support the use of some force, but the level of force an individual's resistance

2  will support is dependent on the factual circumstances underlying that resistance." Id.

3         Here, RePinec's resistance can be analyzed at two separate times. First, at the time he was

4  initially punched in the face and placed in a chokehold, RePinec offered no resistance at all. While

5  he initially challenged the officers by raising his fists, he complied with Fincher's order to drop

6  his fists after Robinson took out his Taser. RePinec also turned around and placed both hands on

7  the wall, an objective indication that he was willing to comply with the officers' commands.[5]

8         Second, RePinec offered moderate resistance to the officers' attempts to restrain him

9  during the blood draw. RePinec admits that he was struggling in the chair and was trying not to let

10  Nurse Stratton take his blood. Nevertheless, RePinec was restrained and surrounded by five police

11  officers; thus, his ability to actively resist was extremely limited, and his ability to flee was

12  nonexistent. See Davis, 478 F.3d at 1056 ("Although Davis was somewhat uncooperative and

13  resisted [the police officer's] attempts to search his pockets, at no point during the encounter did

14  he attempt to flee, nor could he have done so in light of the fact that he was in handcuffs,

15  surrounded by security guards, and confined in a small holding area. Thus, Davis was neither

16  actively resisting arrest nor attempting to flee."). The Court therefore finds that RePinec was not

17  attempting to flee and that his level of resistance was moderate. This factor at both times supports

18  a finding that the force used was unreasonable and disproportionate.

19         Beyond the three considerations specifically listed in Graham, the Court also weighs

20  several additional factors.

21                    (d)    Degree of Need for Blood Sample

22         The Court finds that the officers' reduced need for a blood sample, given that they had

23  already obtained a urine sample, is an additional factor that may be considered and that this factor

24  weighs heavily in favor of RePinec. "[I]f an alternative test is readily available, and the suspect

25  requests it, a rational jury could conclude that it is unreasonable and in violation of the Fourth

26

27         [5] Even if RePinec's actions could be viewed as something less than total compliance with Fincher's
   orders, "a failure to fully or immediately comply with an officer's orders neither rises to the level of active
28  resistance nor justifies the application of a non-trivial amount of force." Nelson, 685 F.3d at 881 (9th Cir.
   2012).

- 15 -

Amendment for police officers to insist on a blood test." <u>Nelson v. City of Irvine</u>, 143 F.3d 1196, 1202-03 (9th Cir. 1998). Here, Fincher had already performed four field sobriety tests on RePinec, administered a breathalyzer test to him, and obtained a urine sample from him. Moreover, the evidence shows that Fincher and Robinson presented the blood and urine testing as an "either-or" proposition and that RePinec understood that by agreeing to give a urine sample, he would not be required to submit to a blood draw.

The Court recognizes that under the law in effect at the time, Fincher was permitted to seek both a blood and urine sample if he determined that the presence of a controlled substance in RePinec's body was in issue, and that Fincher was not required to present RePinec with a choice of tests. <u>See</u> N.R.S. 484C.160(5), (7). Nevertheless, RePinec clearly stated that he preferred the urine test to the blood test and complied with the officers' request for a urine sample. Further, the Court finds that there is no credible evidence in the record that the officers needed a blood sample as evidence to use against RePinec once they had obtained the urine sample or that blood test results would be more convincing or legally significant proof of the presence of a controlled substance than would urinalysis results. Based on this evidence, a reasonable jury could conclude that it was unreasonable to continue to seek the blood sample.

(e)    Failure To Warn

"[T]he giving of a warning or the failure to do so is a factor to be considered in applying the <u>Graham</u> balancing test." <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1284 (9th Cir. 2001). "[S]uch warnings should be given, when feasible, if the use of force may result in serious injury." <u>Id.</u> Here, the Court finds that the officers' failure to give a warning weighs in favor of RePinec. The evidence shows that there were multiple officers on the scene and that there was plenty of time available to give a warning before using any force on RePinec. <u>See</u> <u>Deorle</u>, 272 F.3d at 1284 ("In the present case, the desirability and feasibility of a warning are obvious. . . . There was ample time to give that order or warning and no reason whatsoever not to do so."). While Sergeant Fincher and Deputy Robinson read the implied consent statute or form to RePinec before he gave a urine sample, the Court finds that they did not give him a warning about the force to be used against him when he

1   was facing the wall (punching and chokehold) or the force to be used against him while in the chair

2   (chokehold, punching, forcibly holding him down and prying his arm open with a baton).

3   (f)   Consideration of Alternatives

4   Finally, in analyzing the objective reasonableness of a particular use of force, courts may

5   take into account whether the officer considered the existence of alternative tactics, if any, to effect

6   an arrest or detention. Bryan, 630 F.3d at 831. In this case, the Court finds that there were clear

7   alternatives available to the officers that did not involve the use of any force or the use of

8   significant force.

9   First, the officers could have attempted to reason with RePinec or persuade him to submit

10  to the blood test. The feasibility of this alternative is bolstered by the fact that RePinec had already

11  submitted to various other tests and had already been persuaded, by nonphysical means, to give a

12  urine sample. In addition, there is no credible evidence in the record that time was of the essence

13  in obtaining the blood sample at that precise moment. Based on the record before it, the Court can

14  therefore see no reason why the officers could not have attempted to talk to RePinec further about

15  the blood test. There is no evidence that waiting thirty minutes or even sixty minutes would have

16  impacted the outcome or effectiveness of the blood test.

17  Second, the officers could have restrained RePinec in the chair using the restraints with

18  which the chair was equipped. During the time RePinec was resisting Nurse Stratton's attempts to

19  withdraw blood, his legs were strapped to the restraint chair, but not his arms. RePinec's arms

20  were not secured with the restraints until after the blood draw was already over. This demonstrates

21  that the officers had the capability to use the chair's restraints to secure RePinec's arms, but did

22  not do so.

23  Considering these viable and realistic alternatives that were available to the officers, the

24  Court finds that this factor weighs in favor of RePinec. See Davis, 478 F.3d at 1056 ("Viewing the

25  facts in the light most favorable to Davis, it is clear that other, less abusive methods of conducting

26  the search were available. [The police officer] could have attempted to persuade Davis to submit

27  to the search, could have obtained the assistance of the security guards who were present, could

28  have used less force than he did in seeking to attain his objective, or, having already conducted a

pat-down, could have simply waited to conduct the search until he had delivered Davis to the jail.").

### iii.    Balancing the Competing Interests

Upon review of the above factors, the Court concludes that the officers' interest in using force against RePinec was insufficient to justify their significant use of force in either instance. With respect to the first incident, Cessford's and Brewer's use of force while RePinec had his hands against the wall was unreasonable. The level of force used in this situation was severe: a chokehold and a punch to the face, causing RePinec to lose consciousness. At the time the force was used, RePinec had already complied with Fincher's orders to drop his fists. He had also turned around and placed his hands against the wall. These facts, viewed in the light most favorable to RePinec, demonstrate that Cessford's and Brewer's use of force was unreasonable and violated RePinec's rights under the Fourth Amendment.

With respect to the second incident, the force used by the officers while RePinec was in the restraint chair was also objectively unreasonable. The level of force used here varied. Fincher's use of the baton was a non-trivial use of force, Robinson's and Brewer's punches to the torso were significant uses of force, and Cessford's chokehold was a severe use of force. RePinec was not a flight risk, nor was he posing an immediate threat to anyone's safety or suspected of committing a violent crime. While RePinec was resisting the nurse's efforts to obtain his blood, the situation was static. RePinec was not in danger of escaping or hurting anyone. There were also clear alternatives available. The officers could have attempted to talk with RePinec to convince him to submit to the blood test or attempted to use the chair's built-in restraints. The evidence viewed in the light most favorable to RePinec demonstrates that under these circumstances, each officer's use of force was unreasonable under the circumstances and was in violation of the Fourth Amendment.[6]

---

[6] See Bryan, 630 F.3d at 832 ("[T]he objective facts reveal a tense, but static, situation with Officer MacPherson ready to respond to any developments while awaiting backup. Bryan was neither a flight risk, a dangerous felon, nor an immediate threat. Therefore, there was simply no immediate need to subdue [Bryan] before Officer MacPherson's fellow officers arrived or less-invasive means were attempted.") (internal quotation marks omitted) (alteration in original).

### 2. *Qualified Immunity*

Even though the Court has found that the officers' actions, viewed in the light most favorable to RePinec, violated the Fourth Amendment, the officers may still be entitled to qualified immunity if their actions were "premised on a *reasonable* belief that such force was lawful . . . ." Bryan, 630 F.3d at 832 (emphasis in original) (internal quotation marks omitted). As discussed in Section IV.A.1 above, an officer will be entitled to qualified immunity unless the right violated was clearly established at the time of the incident. To be clearly established, "the contours [of the right] must be sufficiently clear that a reasonable official would understand that his or her actions violated that right." Tarabochia v. Adkins, 766 F.3d 1115, 1125 (9th Cir. 2014) (internal quotation marks omitted). Given that the Fourth Amendment analysis is highly fact-specific, courts do not require that "the very action in question" have been previously ruled unlawful, but rather "consider whether a reasonable officer would have had fair notice that [the action] was unlawful[.]" Id. (internal quotation marks omitted) (alterations in original). In deciding a claim of qualified immunity where a genuine issue of material fact exists, the court accepts the version asserted by the non-moving party. Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013); Coles v. Eagle, 704 F.3d 624, 629 (9th Cir. 2012). Summary judgment must be denied where a genuine issue of material fact exists that prevents a finding of qualified immunity. Sandoval v. Las Vegas Metropolitan Police Dept., 756 F.3d 1154, 1160 (9th Cir. 2014).

Here, resolving all factual disputes in RePinec's favor, the Court finds that none of the Defendant officers are entitled to qualified immunity.

According to RePinec, Detective Cessford either punched him in the face or placed him in a chokehold while RePinec had his hands against the wall. RePinec also states that Cessford placed him in a chokehold while RePinec was in the restraint chair. It was clearly established at the time of this incident that Cessford's unprovoked uses of force were unlawful and unreasonable. "In assessing the state of the law at the time of [RePinec's] arrest, [the Court] need look no further than Graham's holding that force is only justified when there is a need for force." Blankenhorn v. City of Orange, 485 F.3d 463, 481 (9th Cir. 2007). In Blankenhorn, the Ninth Circuit held that this "clear principle" from Graham "would have put a prudent officer on notice that gang-tackling

without first attempting a less violent means" of detaining an individual who was not actively resisting arrest violated the Fourth Amendment. Id. The Ninth Circuit's reasoning in that case applies here. In both instances, Cessford used severe and potentially life-threatening force. While RePinec was resisting the attempt to take his blood, he was not a threat to anyone's safety, was not a flight risk, and there were less violent alternatives available to attempt to gain his compliance. Cessford is therefore not entitled to qualified immunity for his use of force.[7]

Fincher, Brewer, and Robinson are also not entitled to qualified immunity. At least as early as July 2012, it was clearly established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." Nelson, 685 F.3d at 881 (reviewing cases dating back to 2002); see also Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008"). Resolving factual disputes in RePinec's favor, he was resisting Nurse Stratton's attempt to draw his blood, but was not doing so in a way that presented a threat to anyone's safety. While RePinec's conduct in the restraint chair cannot be categorized as purely passive, it is also not the kind of active resistance that would justify the use of a significant degree of force without any attempt at a less violent means of compliance. See Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005) (denying summary judgment on an excessive force claim and stating, in the context of its analysis of the plaintiff's resistance, that "[a]lthough Smith refused to place both his arms behind his back, he did not attack the officers or their dog. In all, it does not appear that Smith's resistance was particularly bellicose or that he showed any signs of fleeing the area"); Mattos v. Aragano, 661 F.3d 433, 445 (9th Cir. 2011) ("Brooks refused to get out of her car when requested to do so and later stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car. In other words, she resisted arrest. We observe, however, that Brooks's resistance did not involve any violent actions towards the officers. In addition, Brooks did not

---

[7] The Court also notes that there is a genuine issue of disputed fact whether it was Brewer or Cessford who placed RePinec in a chokehold while his hands were against the wall. The jury could reasonably find that Brewer was the one who performed this chokehold; thus, Brewer is not entitled to qualified immunity for that act either.

attempt to flee, and there were no other exigent circumstances at the time.") (citation omitted); cf. Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001) ("Jackson's active interference posed an immediate threat to the officers' personal safety and ability to control the group. Under circumstances that Jackson herself described as a "melee," the force applied was reasonable and necessary to control a rapidly evolving and escalating situation.") (internal quotation marks omitted). This categorization of RePinec's resistance is in line with the Ninth Circuit's instruction that resistance "should not be understood as a binary state" and that courts should "eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case." Bryan, 630 F.3d at 830.

Under the circumstances of this case, the Court finds that Fincher, Brewer, and Robinson were on notice that their conduct was unlawful. RePinec was not actively resisting the officers in a way that posed a threat to anyone's safety. He was restrained and surrounded by five officers and therefore was not a flight risk. He had already demonstrated that he could be verbally persuaded, as shown by his eventual agreement to give a urine sample after initially refusing. There was no evidence that the officers could not have waited before attempting to obtain the blood sample. There were also several less violent alternatives available to the officers to obtain RePinec's blood sample.

While the Court is not aware of any case with a factual scenario identical or nearly identical to the facts at issue here, the Ninth Circuit has "never required a prior case on all fours prohibiting that particular manifestation of unconstitutional conduct to find a right clearly established." Torres v. City of Madera, 648 F.3d 1119, 1129 (9th Cir. 2011) (citation omitted) (internal quotation marks omitted). It is enough that officers have "fair warning" that their conduct is unlawful. Hope, 536 U.S. at 741.

First, the Court finds that it was clearly established under these circumstances that Fincher's use of force (using the baton as a pry bar) was unlawful. Fincher was using a method of force that created a significant risk of serious harm and was not approved or justified. The Court finds factually that the level of force necessary to pry open and hold RePinec's arm in these circumstances was quite significant. Given the severity of the force used, the apparent untested

1   nature of the method of force, and the other circumstances of the forced blood draw, the Court

2   finds that Fincher's use of force was unlawful under clearly established law.

3         Second, Brewer's use of force (punches to RePinec's torso and either a punch to the face

4   or a chokehold) and Robinson's use of force (punches to RePinec's torso) were unlawful at the

5   time of the incident. These non-trivial and injury-causing punches were unreasonable under the

6   circumstances and were unlawful under clearly established law.

7

8         **C.  RePinec's As-Applied Fourth Amendment Claim Against Nurse Stratton**

9         Defendants also argue that summary judgment must be granted in favor of Nurse Stratton.

10  The Court disagrees. The evidence creates a genuine issue of material fact as to whether Stratton's

11  actions during the blood draw were reasonable. Moreover, when viewed in the light most favorable

12  to RePinec, the facts demonstrate that Stratton is not entitled to qualified immunity.

13         *1.  Whether Nurse Stratton's Actions Violated the Fourth Amendment*

14                     a.  <u>Applicable Law</u>

15         To allege a Fourth Amendment violation relating to the performance of a blood test, the

16  plaintiff must show that his blood test was "unreasonable and not taken in accordance with medical

17  practices." <u>Ove v. Gwinn</u>, 264 F.3d 817, 824 (9th Cir. 2001). In determining whether the

18  administration of a blood test is reasonable, courts weigh the individual's interests—namely, "the

19  extent to which the procedure may threaten the safety or health of the individual" and "the extent

20  of the intrusion upon the individual's dignitary interests in personal privacy and bodily integrity"—

21  against "the community's interest in fairly and accurately determining guilt or innocence."

22  <u>Winston v. Lee</u>, 470 U.S. 753, 761-62 (1985).

23         With respect to whether the blood test was taken in accordance with medical practices, the

24  Supreme Court has stated that a blood test "made by other than medical personnel or in other than

25  a medical environment" could raise Fourth Amendment concerns, as this "might be to invite an

26  unjustified element of personal risk of infection and pain." <u>Schmerber v. California</u>, 384 U.S. 757,

27  771-72 (1966).

28

b. <u>Genuine Issues of Disputed Fact Exist As to Whether the Administration of the Blood Test Was Reasonable</u>

Under the circumstances of this case, viewing the facts in the light most favorable to RePinec, the Court finds that summary judgment must be denied as to Nurse Stratton for her action of continuing to attempt to draw vials of blood from RePinec after her initial two unsuccessful attempts. A balancing of the <u>Winston</u> and <u>Schmerber</u> factors shows that a reasonable jury could find that Stratton's actions in continuing to attempt to draw blood after the first two unsuccessful attempts were unreasonable.

First, conducting the procedure under normal approved methods poses a minimal threat to RePinec's health and safety. The Supreme Court has long held that "for most people the [blood withdrawal] procedure involves virtually no risk, trauma, or pain." <u>Schmerber</u>, 384 U.S. at 771. Thus, it was reasonable for Stratton to assume, *at the outset of the procedure*, that the blood draw would not cause significant pain to RePinec. The reasonableness of this assumption evaporated, however, once RePinec began to resist the blood draw. The Court has found that throughout the entire procedure, which required multiple attempts to draw the blood, RePinec's arms were moving and were not positioned in a medically appropriate manner for drawing blood. Nurse Stratton required three insertions of the needle into RePinec's left hand to obtain the first vial of blood. Throughout this time, RePinec continued to yell and resist Stratton's attempts. She then stepped back and informed the officers that she could not take the blood if they did not hold RePinec still. RePinec continued to resist, and Fincher used his baton to pry RePinec's arm open. After the first two attempts to draw blood with RePinec resisting, it was apparent that continuing the blood draw involved a significant risk of pain and injury to RePinec. RePinec struggled throughout the entire time of the blood draw and showed no signs of stopping his resistance even after the first vial was successfully drawn. His arm was being pried open by Fincher's baton and he was being held in a chokehold by Cessford, and all the while RePinec continued to struggle and move his arms. It was therefore apparent that continuing the blood draw posed some risk to RePinec of being stuck multiple times with the needle or being stuck in the wrong part of the body or at the wrong angle, thereby causing significant pain and possible injury.

1    Second, the procedure constituted a significant intrusion upon RePinec's personal privacy

2  and bodily integrity. In <u>Winston</u>, the Supreme Court recognized "society's judgment that blood

3  tests do not constitute an unduly extensive imposition on an individual's personal privacy and

4  bodily integrity." 470 U.S. at 762. However, the Court noted that its conclusion was limited to the

5  circumstances presented in <u>Winston</u> and <u>Schmerber</u>, where the intrusion involved virtually no pain

6  and was conducted in a hospital environment using all acceptable medical precautions. <u>Id.</u> at 762

7  n.5.[8] Here, by contrast, RePinec had vehemently refused to submit to a blood test and was being

8  forced to submit to it while being held down in a restraint chair at a local jail by several officers.

9  The fact that his blood was forcibly taken against his will heightens the intrusion upon RePinec's

10  privacy and bodily integrity. <u>See</u> <u>Schmerber</u>, 384 U.S. at 772 ("The integrity of an individual's

11  person is a cherished value of our society."). In addition, the procedure was done at the jail instead

12  of at a hospital, further distinguishing <u>Winston</u> and <u>Schmerber</u> from this case.

13    Third, the community's interest in determining guilt or innocence was diminished in this

14  case because RePinec had already submitted to a urine test and other tests. There was also the

15  apparent physical evidence of the methamphetamine. The Court in <u>Winston</u> noted that the

16  community's interest "is of course of great importance." 470 U.S. at 763. In that case, however,

17  the results of the blood test "were of vital importance if the State were to enforce its drunken

18  driving laws," given the difficulty in proving drunkenness otherwise. <u>Id.</u> Here, Fincher had already

19  accumulated significant evidence of RePinec's impairment. Fincher had already determined that

20  RePinec showed signs of impairment from the field sobriety tests. He had also already obtained

21  RePinec's urine sample, which later came back as presumptively positive for methamphetamine.

22  Defendants produced no credible evidence that these results would not have been sufficient

23  standing alone to prove RePinec's impairment. Therefore, while the community's interest is

24  undoubtedly still significant in this case, the Court finds it to be less significant than in <u>Winston</u>.

25    Finally, there is a genuine issue of material fact as to whether the blood test was taken in

26

27    [8] Moreover, in a recent case, the Supreme Court held that blood tests are "significantly more intrusive" upon individuals' privacy interests than breath tests. <u>Birchfield v. North Dakota</u>,

28  136 S.Ct. 2160, 2184 (2016). The Court found that while the procedure "involves little pain or risk," it nonetheless requires piercing the individual's skin and extracting part of his or her body and "is not one [that many people] relish." <u>Id.</u> at 2178.

accordance with medical practices. The blood draw was done in the booking area of the jail. Defendants have not produced evidence of whether this was a sanitary environment. Nurse Stratton did produce an affidavit in which she stated that she performs blood tests as a regular part of her duties as a registered nurse and that, on the day in question, she withdrew two samples of blood from RePinec "in a medically accepted manner." Stratton's conclusory statement that the blood draw was done in a medically accepted manner is contradicted by several facts in the record. First, Stratton had to stick her needle into RePinec at least five separate times to draw two vials of blood. Second, Nurse Stratton stopped after taking the first vial and told the officers "I can't do this unless you guys have him under control." Third, RePinec produced evidence that he developed an infection from the blood draw that took approximately a month to heal.

Based on this evidence, a reasonable jury could find that Stratton's decision to continue the blood draw after the first two unsuccessful attempts to draw blood was unreasonable and not done in accordance with acceptable medical practices.

### 2. Qualified Immunity

The Court also finds that Stratton is not entitled to qualified immunity for the decision to continue the blood draw after the first two unsuccessful attempts. In 1966, the Supreme Court stated that "serious questions . . . would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse." Schmerber, 384 U.S. at 771-72. Moreover, as early as 1995, it was clearly established that a blood test is subject to the constraints of the Fourth Amendment and is "unreasonable if the degree of force employed to carry it out is excessive." Ellis v. City of San Diego, 176 F.3d 1183, 1191-92 (9th Cir. 1999). Finally, it was clearly established as of 2001 that the procedures used to extract a blood sample must "be reasonable and in accordance with accepted medical practices." Ove, 264 F.3d at 824.

At the time Stratton decided to continue the blood draw after the first two attempts, the Court finds that several facts were apparent to her. She knew that, after two attempts at drawing blood, she had been unsuccessful in completing the extraction. Stratton also knew that RePinec

strongly opposed the blood draw and would continue to struggle if she made future attempts to draw blood. Further, Stratton knew, even after the first vial had been drawn, that additional force would need to be used to obtain a second vial of blood. She saw, after her direction to the officers to get RePinec "under control," that RePinec's arm was being pried open by a baton to expose the area where she would insert her needle for the second vial and that the use of a needle against a resisting individual could cause significant pain and possible injury. She also knew that she could not perform the blood draw unless RePinec was still, and that it was unlikely he would remain still. In addition, Stratton knew that the booking area of the jail was not a medical environment and that performing a blood draw in that environment might increase the risk of infection.[9] Finally, Stratton knew that she had the ability to refuse to conduct the blood draw.

Under these circumstances, the case law cited above placed Stratton on fair notice that continuing the blood draw beyond the first two unsuccessful attempts was unreasonable and in violation of RePinec's Fourth Amendment rights. The Court "do[es] not need to find closely analogous case law to show that a right is clearly established." Bryan, 630 F.3d at 833; see also Hope, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

## V.   CONCLUSION

For the reasons discussed above,

**IT IS ORDERED** that Defendants Chris Brewer and John Cessford's Motion for Summary Judgment (ECF No. 27) is GRANTED.

**IT IS FURTHER ORDERED** that Defendants Todd Fincher, James Robinson, and JoAnne Stratton's Motion for Summary Judgment (ECF No. 28) is GRANTED IN PART and DENIED IN PART. Summary judgment is granted in favor of Defendants to the extent Plaintiff asserts that the seizure of his blood was a *per se* violation of the Fourth Amendment. Summary

---

[9] As discussed above, while Stratton stated in her affidavit that she withdrew the blood in a medically accepted manner, she provided no facts to support this conclusion. On the facts of this case, the Court does not credit that testimony as to the medical acceptability of the blood draw.

judgment is denied to the extent Plaintiff asserts that Defendants used excessive force in seizing his blood.

      **DATED**: <u>July 27, 2016</u>.

                                               _____

                                             **RICHARD F. BOULWARE, II**
                                             **United States District Judge**